THE ILLINOIS CENTRAL RAILROAD COMPANY

*v.*

RICHARD M. MITCHELL.

1. COMMON CARRIER—*liability of an intermediate carrier in a continuous line.* Where a carrier receives goods for transportation over his line, and then to be delivered to another for like transportation, he can not relieve himself of the common law liability of insurer, until he has actually delivered them to the next carrier in the line. If the next carrier is not ready to receive them, and he stores them in a warehouse, the goods will still be considered in transit, and his liability will not be changed to that of warehouseman. That is the case only when the goods have reached their final destination.

2. Thus, where a lot of flour was shipped in Wisconsin, by the Mineral Point Railroad Company, to Warren, Illinois, thence by defendant's railroad to Chicago, and from Chicago by the Union Steamboat Company to Buffalo, and from the last place to New York by the Erie Railroad, marked to "Foster, Gwyn & Co., New York, care of Union Steamboat Company, Chicago, Illinois," and the flour was received by the defendant at Warren, and transported to Chicago, and put in defendant's warehouse late on the 6th of October, 1871, where it was destroyed by fire Oct. 8, 1871, the boat company having no regular time for departure: *Held*, that the defendant was liable to the owner for the loss; but that if Chicago had been the final destination of the flour, the defendant's liability as carrier would have ceased, and that of warehouseman have attached.

APPEAL from the Superior Court of Cook county; the Hon. JOSIAH McROBERTS, Judge, presiding.

Mr. JNO. N. JEWETT, and Mr. CHAS. T. ADAMS, for the appellant.

Messrs. MONROE, BISBEE & GIBBS, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was an action on the case, brought by appellee against appellant, in the Superior Court of Cook county, to recover the value of 100 barrels of flour which were destroyed by fire in appellant's warehouse in Chicago.

A trial was had before the court, a jury having been waived, and judgment rendered in favor of appellee for $600. Appellant excepted to the judgment rendered by the court, and brought the case here by appeal.

It appears from the record that on the 5th day of October, 1871, appellee delivered for shipment to the Mineral Point Railroad Company, at Riverside, Wisconsin, 100 barrels of flour, which was to be shipped by the Mineral Point Railroad Company to Warren, Illinois, thence by appellant's road to Chicago, and from Chicago by the Union Steamboat Company to Buffalo, and from Buffalo by the Erie Railroad to New York.

The flour was receipted to appellee by the Mineral Point Railroad Company, in which receipt the shipping directions were, "Foster, Gwyn & Co., New York, care Union Steamboat Company, Chicago, Illinois." The flour was loaded at Riverside, in one of appellant's cars, and the shipping directions taken by appellant upon receiving it. The flour reached Chicago, and was transferred from the car to appellant's warehouse late on the 6th day of October, where it was destroyed by fire on the 8th. Appellant neither delivered, nor offered to deliver the flour to the Steamboat Company, neither was any notice given the Boat Company of its arrival. The receipt given appellee by the Mineral Point Road, when he delivered the flour at Riverside, read as follows:

"RIVERSIDE STATION, Oct. 5, 1871.

"Received from R. M. Mitchell, by the Mineral Point Railroad, the following articles, in apparent good order, as marked and described below, to be forwarded to the Illinois Central Railroad Company, Warren, Ill., subject to the con-

ditions, regulations and payment of freight as per published tariff of said company:

| Marks. | No. | Articles. | Weight. |
|---|---|---|---|
| Foster, Gwyn & Co., New York, care Union Steamboat Co., Chicago, Ill. | | 100 bbls. flour. | 20,000 |

James Jackson, Agent."

Under the contract the liability of the Mineral Point Railroad Company terminated when it transported the flour to Warren, Illinois, and delivered it there in good condition to appellant. And it is claimed by appellant that its liability as a common carrier ceased when it shipped the flour to Chicago and deposited it in its warehouse; that then the liability of carrier terminated, and that of warehouseman began. In support of this position, we have been referred, by the counsel of appellant, to numerous decisions of this court, none of which, however, decide the point involved in this case. These authorities cited show the rights and liabilities of a common carrier, when goods have reached their final destination, and have been placed in a warehouse, and are there waiting delivery to the consignee. Had Chicago been the final destination of the flour shipped by appellee, then the authorities referred to would have been decisive of the question involved. But this flour was shipped to New York, not Chicago. Appellant knew its destination when it received the goods. Appellee had for some time been shipping flour over the same route. It was not subject to storage or transfer charges at Chicago. For aught that appears, appellee had no knowledge or expectation that his flour would be stored in a warehouse at Chicago. He shipped his goods to be carried to New York, not to be warehoused at intermediate points.

The Mineral Point Railroad Company, having, by contract, limited its liability to ship over its own road and deliver to appellant, the question for determination is, what were the duty and liability of each of the common carriers constituting the entire line over which the flour was shipped from Riverside to New York. The general rule seems to be, when the next carrier in the connection has a place of receiving goods, as in the case of railways, always open, and agents ready to receive them, it would probably be the duty of each preceding carrier to make immediate delivery, at the place of receiving freight, to the next succeeding carrier in the line, and this fixes, ordinarily, the carrier's liability. In this mode a *continuous* liability of carriers is kept up throughout the whole line, which, it seems to us, is the true policy. Vol. 2, Red. 75.

The Union Steamboat Company received freight from appellant upon the river wharf, where appellant delivered it for the boat company. These boats had no regular time of departure, and it appears to have been the habit of appellant to place all goods for shipment by the boats in its warehouse, and when the boats came for it, it was delivered on the wharf. When goods are received by a carrier to be shipped from one point to another on the carrier's own line of road, it is a conceded proposition, if the goods are destroyed *in transitu*, the carrier is liable to the owner, unless the goods are destroyed by the act of God or the public enemies, it being the duty of the carrier, in such case, to ship and safely deliver the goods to their destination. When the goods reach the point to which they are shipped, if the consignee is not there ready to receive them, then the carrier has the right to place them in warehouse.

If, however, while the goods are *in transitu*, the carrier, for its own convenience, or some other cause, should see proper to unload and warehouse them, and while warehoused they should be destroyed by fire, there can be no question but the carrier would be liable in the same manner as if the goods should be destroyed without having been placed in warehouse,

and this proceeds upon the ground that the liability of the carrier exists and continues while the goods are *in transitu.*

It is also clear, where goods are delivered at the depot for shipment, and the carrier, prior to shipment, places them in its warehouse for safe-keeping or otherwise, and the goods are destroyed, the railroad company will be liable as a common carrier, and not as warehouseman, for the reason, legally, the goods are destroyed *in transitu.*

Upon the same principle, the undertaking in the case under consideration was continuous from Riverside to New York, although the goods were to be transported over the lines of several and distinct carriers. The duty and liability of each carrier was to ship over its own and deliver to the next succeeding line. This affords protection to the shipper from loss of his goods from the time he delivers them to the carrier for shipment, until they are delivered to the point to which they are consigned, and, as is well said by Redfield, a continuous liability of carriers is kept up through the whole line, which is the true policy.

While this rule gives protection to the shipper, it does no injustice to the carrier. It does not enlarge the carrier's liability from what it is in case goods are shipped from one point to another on its own line, for the reason that when the goods reach the end of the carrier's line, it relieves itself of responsibility by delivering them in good order to the next succeeding carrier, whereas, in the other case, the liability of the carrier terminates when the goods are stored in the warehouse.

The case of *Mills et al.* v. *Mich. Cen. R. R. Co.* 45 N. Y., is directly in point. In that case, 298 bags of wheat were shipped on the road, at Kalamazoo, Mich., on the 16th day of October, to go to Detroit by rail, thence to Buffalo, N. Y., by propellers by the lakes, thence to Albany by the New York Central. The wheat was consigned to Mills & McMartin, Albany, N. Y. The wheat arrived at Detroit on the 18th, and on the night of that day was burned. Notice was given

by the railroad to the propellers that the wheat was there ready for shipment. The wheat was ready for the boat on the day it was burned, but no boat was ready to take it. The court held that a reasonable time, which must elapse after notice, did not expire until a vessel, which, in the ordinary course of business, could receive the goods, had failed to do so. See also *Gould* v. *Chapin*, 20 N. Y. 259. The court, in deciding the case, say: "A carrier, in possession of goods to be delivered to a subsequent carrier for transportation, remains liable as insurer, although the second carrier, after notice and request to do so, has neglected, for an unreasonable time, to secure them."

The identical question raised in this case has, however, been decided by the Supreme Court of the United States, in case of *Mich. Cen. R. R. Co.* v. *The Mineral Springs Manufacturing Co.* 16 Wall. 318. The facts upon which the decision was made are, that in October, 1865, the railroad company received at Jackson, a station on its line. of road west of Detroit, a lot of wool, and gave. a receipt for it. The wool was consigned to Stafford, Conn. The shipper gave instructions, which were in the way-bill, that from Detroit it should be shipped by lake in boats. It appeared that the line of steamers could not carry freight as fast as it arrived at Detroit. The wool was shipped to Detroit, and there put in the warehouse by the railroad company, where it remained six days awaiting transportation by boat, when it was destroyed by fire. On these facts the court say: "In such a case, it is the duty of the carrier, in the absence of any special contract, to carry safely to the end of its line, and deliver to the next carrier on the route, beyond. This rule of liability is adopted generally by the courts in this country. It is unfortunate for the interests of commerce that there is any diversity of opinion on such a subject, especially in this country; but the rule that holds the carrier only liable to the extent of his own route, and for the safe storage and delivery to the next carrier is, in itself, so just and reasonable, that we do not hes-

itate to give it our sanction.   Public policy, however, requires that the rule should be enforced, and will not allow the carrier to escape responsibility in storing the goods at the end of its own route, without delivering, or an attempt to deliver, to the connecting carrier.   If there be a necessity for storage, it will be considered a mere accessory to the transportation, and not as changing the nature of the bailment.   It is very clear that the simple deposit of the goods by the carrier in his depot, unaccompanied by any act indicating an intention to renounce the obligation of a carrier, will not change or even modify his liability.

" It is argued, however, that there is no difference between goods to be delivered to the owner at their final destination, and goods deliverable to the owner or his agent for further carriage; that in both cases, as soon as they are ready to be delivered over, they are awaiting delivery.   This position, although plausible, is not sound."

See also *Fenner* v. *R. R. Co.* 44 N. Y. 505; *McDonald* v. *Western R. R. Co.* 34 N. Y. 497.

The principles announced by the Supreme Court of the United States in the case cited *supra*, are just, and the rule there adopted can not fail to work advantageously, both to the shipper and the common carrier.

So long as the transportation companies hold out to the shipping interest of the country that they constitute a continuous and through line for transporting the products of the country to the eastern markets, and as such receive goods to be carried, the transfer of goods from the line of one to that of the other is a matter they must arrange among themselves, but the shipper, in order to be properly protected, holds the first carrier in the line until his goods are safely delivered to the next, and so on until the goods reach their final destination.

In this way the shipping interest of the country is protected, and each carrier in a continuous line is only required to discharge its common law duty—to safely carry over its

own line, and deliver to the next succeeding carrier in the line.

Appellant having received these goods at Warren, Illinois, the law required it to carry and deliver them to Union Steamboat Company at Chicago. This it failed to do, and therefore is liable to appellee for the value of the flour.

The judgment will therefore be affirmed.

*Judgment affirmed.*